IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:16CR142 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL L. SHOCKLEY, | ) | GOVERNMENT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

Now comes the United States of America, by and through its attorneys, Carole S. Rendon, United States Attorney, and Paul M. Flannery, Assistant United States Attorneys, and hereby submits this memorandum for the Court's consideration in determining a sentence for the defendant, Paul L. Shockley, that is sufficient but not greater than necessary to comply with the purposes of sentencing. The government submits that, after considering the 18 U.S.C. § 3553(a) factors, and in particular, the seriousness of the offense, and the need to deter the defendant and protect the public from the defendant's future crimes, a sentence at the highest end of the advisory guidelines range is appropriate.

I.  Factual Background

  1.  D'Legato Investment Scheme

An investigation led by the FBI revealed that Defendant Paul Shockley and others established certain businesses, including D'Legato Estates and Facilities, LLC, D'Legato Group, LLC, and Wintermyer and Shockley Enterprise, LLC (together, "D'Legato"). D'Legato was purportedly a start-up business venture that would engage in the business of operating an assisted

living center.  At the time, Shockley and D.W. were in a personal relationship and would be responsible for establishing and operating D'Legato along with A.W.  (D.W.'s mother).  Neither Shockley, D.W., A.W., nor D'Legato had ever owned or operated any facility as an assisted living center.

From approximately 2013 through 2015, Shockley and others defrauded Victim 1, her husband, and daughter and son-in-law, all residing in New York (together, the "investors"), by causing the investors to invest in D'Legato through false and fraudulent misrepresentations and omissions of material facts about the nature and dispositions of the investments, and using the credit card accounts and personal identifying information of victim investors without their authority.

Through these false representations and omissions, Shockley and others caused the investors to liquidate their retirement savings to invest in D'Legato.  In fact, Shockley persuaded Victim 1 to use part of her retirement savings to make substantial payments on unauthorized credit card transactions he and others had made by falsely stating to Victim 1 the payments would be credited as part of her "investment" in D'Legato, on which she would purportedly make a substantial return.  Shockley also fraudulently obtained a loan against a life insurance policy of Victim 1, and by falsely representing to Victim 1 that she would receive a substantial return on her investment, caused Victim 1 to invest the life insurance policy loan in D'Legato.  This and other offense conduct of Shockley caused substantial financial hardship to the investors, including significant loss of their retirement and substantial harm to their credit.

The investors never received any return on the investment they made with D'Legato.  Rather, Shockley and others personally enriched themselves by using the investment money in the D'Legato bank accounts to make payments on D'Legato credit card accounts on which

Shockley and others ran up significant personal expenditures, including luxury cars, high-end clothing, and expensive vacations. The combined loss from the D'Legato fraudulent scheme, including unauthorized transactions on the investor's credit cards, D'Legato investment checks, and additional expenditures on the D'Legato credit card accounts, is approximately $563,055.

### 2. Unauthorized Credit Card Use

Throughout the scheme to defraud, Shockley would use the identification of some of his victims without lawful authority to open unauthorized credit card accounts and make unauthorized credit card purchases. In November 2013, Shockley visited the home of Victim 1 and Victim 2 in New York for a family wedding. While at their home, Shockley falsely claimed to Victim 1 and Victim 2, as he had on previous occasions, that he was significantly wealthy and a multi-millionaire.

At the conclusion of the wedding weekend, Shockley asked Victim 1 for money because he claimed he had insufficient resources to return home from New York. Shockley induced Victim 1 to provide her personal credit card information for the sole purpose of making small gas and food purchases related to his trip home from New York. Shockley, however, charged thousands of dollars on Victim 1's credit card, which was much more than Victim 1 had authorized.

In or around this same time, Victim 1 began to receive e-mails from someone claiming to be M. Shockley (hereinafter, "M.S."). "M.S." claimed to be Shockley's mother, while M.S. was, in fact, Shockley falsely purporting to be his wealthy mother. Shockley, posing as M.S., convinced Victim 1 to provide her personal identifying information and personal credit card information to M.S. and Shockley under the false representation that Victim 1's credit card bills would be paid off through the purported Shockley family businesses' voucher system. In or

around December 2013, at Shockley's urging, Victim 1 mailed her own and Victim 2's credit cards and personal identifying information to "M.S." at an address in Lisbon, Ohio.

Contrary to Shockley's false representations and promises, Victim 1 and Victim 2's credit cards were never paid off in the Shockley family businesses' voucher system, as Shockley claimed they would.  Rather, Shockley and others incurred more than $308,000 in unauthorized purchases and cash advances, on at least seventeen (17) separate credit cards, in the name of Victim 1 and Victim 2.

### 3. We Love Snobs Investment Scheme

From in or around January 2015 through in or around December 2015, Shockley and others defrauded Victim 5 and Victim 6 (together, "the investors"), in much of the same manner as the D'Legato scheme by lying and enticing them to invest in We Love Snobs, an on-line luxury consignment store.  Some of the many lies Shockley told his investors include:  Shockley routinely claimed to investors that he was significantly wealthy, when he was not; Shockley falsely claimed that his mother was in control of the purported Shockley family businesses, when he knew she was not; Shockley and others represented that the We Love Snobs investment was properly registered under federal securities laws, when they knew it was not; and Shockley and others misled investors to believe that their funds would yield a substantial return on their investment, when, in fact, he and others misused investor money to enrich themselves with luxury shopping sprees, unreasonably high salaries, and pay personal expenses.  Although some investors received a fractional return of their investments, the investors incurred substantial losses.  In addition, the investors did not receive the hundreds of thousands of dollars of gains on their investments that Shockley and others falsely promised to them during the scheme.

Based on these false representations and omissions, the investors invested substantial amounts of money into We Love Snobs.  Between on or about February 27, 2015 and on or about April 1, 2015, the investors caused funds to be wired into the We Love Snobs bank account.  The combined losses of the We Love Snobs fraudulent scheme is $280,000.

4.     **The Hearst Scheme and Talent Resources Schemes**

Hearst Communications, Inc. is a diversified media company that provides strategic investments in companies involved in media and technology.  In or around July 2015, after engaging in the D'Legato and We Love Snobs schemes, Shockley began conducting an on-line women's clothing business, Shop L'Amour or L'Amour Bisou (collectively known as "L'Amour").  As if the fraudulent schemes outlined above were not enough for Shockley, from in or around October 2015 through in or around January 2016, Shockley defrauded Hearst by causing Hearst to extend marketing services on credit to Shockley through false and fraudulent misrepresentations and omissions of material facts about the nature of his business activities and finances.  Hearst extended $56,000 in advertising services credit to Shockley for which he did not intend to pay, and in fact did not pay.

Additionally, in or around December 2015, Shockley defrauded Talent Resources, a celebrity, sports and entertainment marketing company which coordinates celebrity appearances, performances, endorsements and social media campaigns to market products.  Shockley contacted Talent Resources and requested marketing services for L'Amour claiming that he was running a special promotion.  He requested that Talent Resources coordinate celebrities to wear L'Amour's clothing and post the images on social media.  Shockley entered into a contract with Talent Resources for $100,000 to have celebrity, V.H., wear L'Amour clothing and have the

images posted on social media. At the time Shockley entered into the contract, he did not intend to pay, and in fact did not pay, the contract price.

### 6. Flight From Prosecution and Perjury

In addition to the charged conduct, the government learned that, after Shockley was arrested and detained pretrial, he suborned materially false testimony at a detention hearing before Magistrate Judge Nancy A. Vecchiarelli. The government discovered that Jessica Buffa, in exchange for payments and the promise of future payments from Shockley, falsified the length and nature of her relationship with Shockley in order that he be released on bond. Buffa testified that she had known Shockley for three years and that they previously worked together, when in fact Buffa and Shockley did not know one another and had never met prior to the detention hearing. These false material statements were material to the Court's consideration of the defendant's pretrial release.

Additionally, while out on bond, Shockley removed his ankle monitor and fled the Northern District of Ohio to avoid prosecution for his crimes. During his flight, he engaged in additional fraudulent and dishonest conduct, including passing bad checks and seeking to entice additional victims to "invest" with Shockley based on his false assertions regarding his wealth and business experience and dealings.

## II. Sentencing Law

The U.S. Supreme Court has held that the U.S. Sentencing Guidelines are "effectively advisory." Booker, 543 U.S. 220, 245 (2005). The Supreme Court advised sentencing courts that, even "[w]ithout the 'mandatory' provision, the [Sentencing Reform] Act nonetheless requires judges to take account of the Guidelines together with other sentencing goals," specifically citing those goals listed in Title 18, U.S.C. § 3553(a). Id. at 259. Therefore, a

district court must properly calculate and consider the advisory Guidelines range. See, e.g., Gall v. United States, 522 U.S. 38 (2007); United States v. Haj-Hamed, 549 F.3d 1020 (6th Cir. 2008).

In Rita v. United States, 551 U.S. 338 (2007), the Supreme Court held that courts of appeals may apply a non-binding presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines. Id. at 347. The Supreme Court further held that rather than having independent legal effect, the courts of appeals' "reasonableness" presumption "simply recognizes the real-world circumstance that when the district judge's discretionary decision accords with the Commission's view of the appropriate application of §3553(a) in the mine run of cases, it is probable that the sentence is reasonable." Id. at 350-51.

To facilitate appellate review, the Sixth Circuit has encouraged the sentencing judge to "explicitly state [the] reasons for applying particular Guidelines, and sentencing within the recommended Guidelines range, or in the alternative, for choosing to sentence outside that range." United States v. Jones, 399 F.3d 640, 650 (6th Cir. 2005); see also Gall v. United States, 522 U.S. 38 (2007); United States v. Haj-Hamed, 549 F.3d 1020 (6th Cir. 2008).

### III. The Guidelines Calculation

The U.S. Probation Office (hereinafter, the "USPO") has set forth the following advisory guidelines calculation in the Presentence Investigation Report (PSR):

| | | |
|---|---|---|
| Base Offense Level: | 7 | § 2B1.1(a)(1) |
| Loss: $550,000 >$1,500,00 | +14 | § 2B1.1(b)(1)(H) |
| Substantial Financial Hardship | +2 | § 2B1.1(b)(2)(A)(iii) |
| Unauthorized Use of Means of Identification | +2 | § 2B1.1(b)(11)(C)(i) |

| | | |
|---|---|---|
| Obstruction of Justice | +2 | § 3C1.1 |
| Acceptance of Responsibility | +0 | |
| Total offense level | <u>27</u> | |

The government believes the USPO properly determined Shockley's total offense level as 27. With a criminal history category of II, his advisory guideline range is 78-97 months.

It should be noted that under the plea agreement, the government had intended to recommend a three-level reduction for acceptance of responsibility if Shockley's conduct continued to demonstrate acceptance of responsibility, which it has not. Among other things, Shockley fled the district to avoid sentencing and engaged in additional criminal conduct. Therefore, the government withdrew its support of an acceptance of responsibility reduction. Certain guidelines enhancements are more specifically discussed below.

1. **Loss**

Under U.S.S.G. §2B1.1(b)(1)(H) a 14 level increase is added if the loss was more than $550,000 but less than $1,500,000. In this case, the actual and intended loss was $776,142.99, which results in the 14-level increase.

2. **Substantial Financial Hardship to One or More Victims**

The PSR properly assigned a +2 level enhancement under U.S.S.G. § 2B1.1(b)(2)(A)(iii) because the D'Legato fraudulent scheme set forth above caused substantial financial hardship to Victims 1 and 2. They liquidated more than $200,000 from their retirement savings to issue investment checks for D'Legato and to pay for Shockley's unauthorized credit card purchases, based on Shockley's false representation they would be credited with additional investment in D'Legato. Victims 1 and 2 are in their late sixties to early seventies, and because of their age and limited remaining assets, they have suffered a significant loss in their ability to retire. They have

8

also suffered significant harm to their credit because of the substantial number of credit card transactions Shockley conducted with their credit card accounts and personal identifying information without their authority. Shockley has offered no objection to this properly applied enhancement.

### 4. Unauthorized Use of Means of Identification

The PSR properly included a +2 level enhancement under § 2B1.1(b)(11)(C)(i) because Shockley used the personal identifiers of Victims 1 and 2 to fraudulently obtain credit cards in their name without their authorization.

### 5. Obstruction of Justice

While on supervision and after pleading guilty, Shockley cut off his monitoring bracelet, mailed a suicide note to his mother (in which he essentially blamed his criminal conduct on others), and fled the jurisdiction. Fearing for Shockley's safety and others, considerable resources, time, and effort were spent by the FBI and U.S. Postal Inspection Service to eventually track down Shockley in Rhode Island. Under U.S.S.G. § 3C1.1, Application Note 4(E), a two level adjustment is warranted where, as here, a defendant escapes or attempts escape from custody before sentencing or willfully fails to appear as ordered for a judicial proceeding. For these reasons, the USPO properly assigned a +2 level enhancement under § 3C1.1 for obstruction of justice. Shockley also does not object to this enhancement.

## IV. The 18 U.S.C. § 3553(a) Factors

An examination of the statutory factors under 18 U.S.C. § 3553(a) shows that a sentence within the guidelines range outlined above is appropriate. Title 18, United States Code, Section 3553(a) states, in pertinent part:

> (a) Factors to be Considered in Imposing a Sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set

forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider:

>    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>    (2) the need for the sentence imposed;
>
>    >    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>    >
>    >    (B) to afford adequate deterrence to criminal conduct;
>    >
>    >    (C) to protect the public from further crimes of the defendant; and
>    >
>    >    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

* * *

18 U.S.C. § 3553(a).

### 1.  Nature and Circumstances of Offenses

The nature and circumstances of the offense call for a significant sentence. Shockley created numerous complex ruses to continuously mislead his investors to believe that their funds would be used to operate the various businesses he was peddling at the time. He also promised a substantial rate of return on their investment all the while using the investment monies for his own personal gain. In doing so, he lied to his investors, concealed material facts from them, belittled them and called them degrading names, stole from them, and even reduced some of his victims to tears by aggressively demanding additional monies from them. Shockley abused the trust of friends and associates by fabricating stories of wealth and even went so as far as to make up a story about his own mother being a wealthy business owner. Shockley took advantage of his victims, and his egregious conduct was made possible by the misplaced trust his investors had in him.

      **2.      History and Characteristics of Defendant**

      Shockley has proven that the only way he can function in society is by purporting to be something and someone he is not. While doing so, he takes advantage of the people that trust him. Little to nothing in Shockley's personal history substantially mitigates the offenses he has committed. Shockley has no work history. His own conduct demonstrates how he lives from one fraudulent scheme to the next.

      Additionally, Shockley has a history of abusing even his own family members. Indeed, Shockley could not stay with his parents while on pretrial release because they were potential victims and witnesses in the case because Shockley had previously stolen his mother's identification so that he could obtain an unauthorized loan. He also used his mother, a hard-working, handicapped woman employed at Wal-Mart, to further his fraud scheme by pretending that she was a wealthy woman who owned her own business to lure investors into his schemes. And what may be the his most egregious behavior, Shockley sent his mother a false suicide note when he fled prosecution in the Northern District of Ohio simply to throw off investigators who were looking for him. One can only imagine the terror she must have felt thinking that her son had killed himself.

      **3.      The Need to Adequately Deter Future Crime of the Defendant and Protect the Public**

      Another factor to be considered when imposing a sentence is deterring the defendant from committing the conduct again. Shockley's schemes to defraud were not one-time occurrences. Shockley repeatedly employed the same or similar techniques over and over which was evident by the schemes outlined above. Shockley continued to gain the trust of his investors by his grandiose false tales of wealth and successful family businesses.

Even while on pretrial release, and after pleading guilty, Shockley continued to engage in fraudulent conduct.  During the government's search for Shockley when he fled the jurisdiction, agents interviewed the owner of the Bed and Breakfast where he had been staying and learned that Shockley stayed under an alias and told the owner that he was the wealthy owner of a logo company and was in Massachusetts to open a new location for his business.  Shockley even went to view a vacant building location for rent with the owner and provided him a false social security number for a background check to lease the building for Shockley's business.

Shockley has not been able to take responsibility for his conduct even after he voluntarily entered into a plea agreement.  After pleading guilty and admitting to his involvement in the above schemes, he mailed his mother a suicide note, which took the blame off himself and placed blame on others.

Shockley's conduct demonstrates that it is not a question of if, but when, he will return to defrauding individuals for personal gain after serving his sentencing in this case.  Shockley clearly needs a significant incarceration sentencing in order to adequately deter him from committing additional crimes in the future, and, more importantly, to protect the public from his future criminal conduct.

**4.     The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

Shockley's conduct was extensive, long-lived, and fueled by nothing more than insatiable greed for a luxurious lifestyle he could not afford.  He has destroyed lives through his criminal endeavors.  He caused victims in the D'Legato and We Love Snobs schemes to lose substantial savings that were designed for retirement or inheritance for their children and grandchildren.

Only a sentence at the highest end of the guidelines range will accomplish the goals of sentencing, and provide, among other things, sufficient punishment for Shockley.

**V.      Conclusion**

For all of these reasons, an incarceration sentence at the highest end of the guidelines range is the minimum sentence that is sufficient, but not greater than necessary, to satisfy the goals of sentencing set forth in 18 U.S.C. § 3553(a).

    Respectfully submitted,

    CAROLE S. RENDON
    United States Attorney

By:   /s/ Paul M. Flannery
    Paul M. Flannery (OH: 0091480)
    Assistant United States Attorney
    United States Court House
    801 West Superior Avenue, Suite 400
    Cleveland, OH 44113
    (216) 622-3958
    (216) 522-2403 (facsimile)
    Paul.Flannery@usdoj.gov

CERTIFICATE OF SERVICE

     I hereby certify that on this 30th day of December 2016 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's system.

                                                              /s/ Paul M. Flannery
                                                              Paul M. Flannery
                                                              Assistant U.S. Attorney